McGEE, Chief Judge.
 

 *604
 
 Greensboro Police Department Detective M.R. McPhatter ("Detective McPhatter") was working in a drug interdiction capacity on the morning of Monday, 6 October 2014
 
 *96
 
 when he positioned himself near a Shell gas station with a convenience store ("the store") drop-off point for the China Bus Line. This line ran between Greensboro and New York City and, in the past, Greensboro police had made arrests of people who had transported illegal narcotics on that bus line. Detective McPhatter was wearing plain clothes and waiting in an unmarked car when the bus arrived at the store between 6:00 a.m. and 6:30 a.m. on 6 October 2014. Detective McPhatter observed Gregory Charles Baskins ("Gregory") and Tomekia Bone ("Bone") exit the bus. At that time, Detective McPhatter was not familiar with either Gregory or Bone. Both Gregory and Bone were carrying "smaller bags. Just for like a weekend-type trip, change of clothes." Detective McPhatter watched Gregory and Bone enter the store, and then saw Gregory exit the store a couple of minutes later. After leaving the store, Detective McPhatter observed Gregory walking "backwards" in his direction, approach to about four parking spaces distance, and "gave a look inside my car as to see if he knew me or he was trying to ... see who I was inside the vehicle. And then he kind of gave me a shoo-off type thing and then kind of walked back inside the store." At approximately the same time, Detective McPhatter observed a burgundy Buick ("the Buick") pull into the parking lot of the store. The driver of the Buick was later determined to be Gregory's brother, Sandy Keith Baskins ("Defendant"). Gregory got into the front passenger side of the Buick and Bone got into the rear right seat. The Buick then left the store's parking lot with Gregory and Bone inside.
 

 Detective McPhatter had taken down the license plate number for the Buick, and he input that information into his mobile terminal, which accessed the Department of Motor Vehicles ("DMV") data associated with that license plate number. According to Detective McPhatter's testimony, the Buick's "registration had ... expired-it had expired and it had an inspection violation also." Detective McPhatter relayed that information to other officers in the area because he wanted to stop the Buick in order to investigate possible drug trafficking activity. The information relating to the license plate of the Buick was obtained from DMV. Detective McPhatter did not want to stop the Buick himself because he did not want Gregory to recognize his vehicle as the same vehicle that had been waiting in the parking lot of the store.
 

 *605
 
 Greensboro Police Department Detective M.P. O'Hal ("Detective O'Hal") was the officer who actually stopped the Buick on the morning of 6 October 2014. Detective O'Hal, who was part of the same drug interdiction squad as Detective McPhatter, had been alerted by Detective McPhatter concerning Gregory's actions at the store. Detective McPhatter had read the Buick's license plate number over the radio, so Detective O'Hal was able to type that information into his mobile service computer and obtain information concerning the license plate from DMV. A printout of the DMV screen information relied upon by Detective O'Hal was provided to Detective O'Hal during his testimony:
 

 [THE STATE:] Want to show you what I've marked as State's 1 and 2, couple of communications printouts, and just ask you about the information in each of these documents. You say when you initially ran the information through the Department of Motor Vehicles, it reflected that the license itself was expired.
 

 [DET. O'HAL:] Yeah. The inspection was expired on it.
 

 [THE STATE:] Okay. And I want to ask about each of these. Let me begin with what I've marked as State's Exhibit Number 1. If I may approach, Your Honor.
 

 THE COURT: Yes.
 

 [THE STATE:] Can you explain what this first document reflects?
 

 [DET. O'HAL:] This is what I saw on my-I call it a visual MCT or my computer, which was with me that day of the stop. And it shows that the customer I.D.'s name or driver's license number, the name of the person that the vehicle is registered to, and it says "plate status expired." And it says that it was issued on 9-26-2013 and showed a status of being expired.
 

 ....
 

 [THE STATE:] And so in layman's terms ... State's Exhibit Number 1 ... reflect[s]
 

 *97
 
 the status of the plate and the inspection on the date in which it was stopped in State's 1.
 

 [DET. O'HAL:] Correct.
 

 ....
 

 *606
 
 [THE STATE:] Okay. And that information reflected in State's 1 ... is the same information that was available to you on that particular day.
 

 [DET. O'HAL:] Yes.
 

 The communications printout, State's Exhibit 1, which was the same information Detective O'Hal relied upon to justify the stop of the Buick, contained the following two lines of information relevant to this appeal:
 

 PLT STATUS: EXPIRED
 

 ISSUE DT: 09262013 VALID THRU: 10152014
 

 This DMV registration request response printout contained
 
 no
 
 information indicating the status of the Buick's inspection. As indicated in the information provided by DMV, the Buick's registration, though technically expired, was still valid on 6 October 2014, and would remain valid through 15 October 2014. This was because, according to N.C. Gen.Stat. § 20-66(g),
 

 [t]he registration of a vehicle that is renewed by means of a registration renewal sticker expires at midnight on the last day of the month designated on the sticker. It is lawful, however, to operate the vehicle on a highway until midnight on the fifteenth day of the month following the month in which the sticker expired.
 

 N.C. Gen.Stat. § 20-66(g) (2015).
 

 Detective O'Hal successfully initiated the stop, and approached Defendant, who was the driver of the Buick. Detective O'Hal informed Defendant that he had been stopped due to an expired registration and an inspection violation, and asked Defendant to produce his driver's license and registration. Defendant informed Detective O'Hal that his license had been revoked. According to Detective O'Hal's testimony, while he was talking to Defendant, he noticed Gregory acting very nervous and sweating profusely. Detective O'Hal then noticed Gregory glance at Bone nervously, and Detective O'Hal noticed that Bone was also acting nervous. Detective O'Hal then asked if there were any weapons in the Buick, and Defendant responded that there were not. Detective O'Hal asked Defendant if he would consent to a search of the Buick, and Defendant gave consent. Defendant, Gregory, and Bone all exited the Buick, and Detective O'Hal conducted a sniff search with his drug-trained canine ("K-9"). The K-9 alerted in both the front and rear right side passenger seats, indicating the possible recent presence of illegal
 
 *607
 
 narcotics. Based upon the alert of the K-9, and the behavior of Gregory and Bone, they, along with Defendant, were searched. Approximately six ounces of what was later determined to be heroin was recovered from inside Bone's pants, and the suspects were arrested.
 

 Defendant was indicted on 1 December 2014 for conspiracy to traffic in heroin, trafficking by possession of 28 grams or more of heroin, and trafficking by transportation of 28 grams or more of heroin. Defendant filed a motion to suppress on 27 April 2015. The suppression hearing was conducted on 6 July 2015, and Defendant's motion to suppress was denied by order entered 10 July 2015. Defendant was tried, found not guilty of the conspiracy charge, and found guilty of the two trafficking charges. Judgment was entered on 14 July 2015, and Defendant received an active sentence of 225 to 282 months. Defendant specifically preserved his right to appeal the denial of his motion to suppress.
 

 I.
 

 Defendant challenges two of the trial court's findings of fact relating to Detective O'Hal's initial stop of the Buick, findings fourteen and eighteen. The relevant portions of the contested findings are as follows: "Detective McPhatter could see the license plate on the Buick, so he ran the number through DMV and learned the registration had expired, as had the inspection (last inspected 8-31-13). He relayed that information to the team members." "[Detective] O'Hal, who had also confirmed the DMV information about the registration and inspection ... activated his lights to stop the Buick."
 

 *98
 
 We first address the evidence concerning the Buick's registration. N.C. Gen.Stat. § 20-66(g) states:
 

 When Renewal Sticker Expires.-The registration of a vehicle that is renewed by means of a registration renewal sticker expires at midnight on the last day of the month designated on the sticker. It is lawful, however, to operate the vehicle on a highway until midnight on the fifteenth day of the month following the month in which the sticker expired.
 

 N.C. Gen.Stat. § 20-66(g). The Buick's license plate had a sticker on it indicating that the plate was valid until 30 September 2014. By operation of N.C. Gen.Stat. § 20-66(g), it was lawful to operate the Buick until midnight of 15 October 2014.
 
 Id.
 
 In accord with N.C. Gen.Stat. § 20-66(g), the communications printout, which was "the same information that was available to" Detective O'Hal prior to the stop, clearly stated that
 
 *608
 
 the plate registration was: "VALID THRU: 10152014[,]" or 15 October 2014. Detective O'Hal stopped the Buick on 6 October 2014.
 

 As far as the registration was concerned, Defendant was operating the Buick lawfully, and Detective O'Hal was provided confirmation of this fact in the information he requested and received from DMV. While it might be technically true that the registration was expired, the trial court's findings of fact fail to indicate that the registration was still valid on 6 October 2014, and this information was necessary for determination of the legitimacy of the stop based upon an alleged registration violation. Those portions of findings of fact fourteen and eighteen indicating that the Buick's registration had expired are supported by substantial record evidence, but they do not, on these facts, establish that the Buick was being operated in an unlawful manner.
 

 II.
 

 Next, we address the findings related to the inspection status of the Buick. It constitutes an infraction when a person "[o]perates a motor vehicle that is subject to inspection under this Part on a highway or public vehicular area in the State when the vehicle has not been inspected in accordance with this Part, as evidenced by the vehicle's lack of a current electronic inspection authorization or otherwise." N.C. Gen.Stat. § 20-183.8(a)(1) (2015). "A law enforcement officer who has probable cause to believe a person has committed an infraction may detain the person for a reasonable period in order to issue and serve him a citation." N.C. Gen.Stat. § 15A-1113(b) (2015).
 

 However, as the State concedes, "the inspection violation itself does not appear on the computer screens that the officers were looking at when they ran the [ ] Buick's license number." The State argues, however, that "the record contains plain and direct testimony from both Officer McPhatter and Officer O'Hal that they ran the tags on the Buick, learned that the registration had expired, and that there was an inspection violation, because the Buick had last been inspected 31 August 2013[.]" It is true that Detective O'Hal testified that the information he received from DMV indicated that the Buick's inspection was not current. However, Detective O'Hal also testified that State's Exhibit 1, a printout of a DMV request for the Buick, was identical to the information he received on 6 October 2014. Though it is possible Detective O'Hal had access to additional information concerning the inspection status of the Buick, Detective O'Hal testified that he based his stop solely on the information included in State's Exhibit 1. If that testimony was correct, then Detective O'Hal could not have known that the Buick's inspection was not current.
 

 *609
 
 The only non-testimonial evidence admitted at the hearing that included information about the inspection status was a copy of the registration card for the Buick, which stated: "INSPECTION DUE 09/30/2014." This evidence cannot have served as the basis for Detective O'Hal's testimony that the inspection was out-of-date for two reasons. First, Detective O'Hal did not have this card before he initiated the stop. In fact, he apparently did not obtain the card at any time during the stop. Second, the registration card cannot provide up-to-date information concerning whether the Buick had already been inspected for the purposes of registration
 
 *99
 
 renewal. According to N.C. Gen.Stat. § 20-183.4C(a) :
 

 (6) A vehicle that has been [previously] inspected in accordance with this Part must be inspected by the last day of the month in which the registration on the vehicle expires.
 

 (7) A vehicle that is required to be inspected in accordance with this Part may be inspected 90 days prior to midnight of the last day of the month as designated by the vehicle registration sticker.
 

 N.C. Gen.Stat. § 20-183.4C(a) (2015). The owner of a vehicle has ninety days prior to the expiration of the inspection within which to have the vehicle inspected.
 
 [1]
 
 There is no record evidence indicating that Detective O'Hal was provided information indicating that the Buick had not been properly inspected prior to the 6 October 2014 stop. Again, we recognize that the record may not contain all the relevant evidence available to Detective O'Hal on 6 October 2014, but our review is limited to the record evidence in this regard. This record does not contain substantial evidence that the Buick was being operated with an expired inspection status and, therefore, those portions of findings of fact fourteen and eighteen stating otherwise are overruled.
 

 III.
 

 When ruling on a motion to suppress following a hearing, "[t]he judge must set forth in the record his findings of facts and conclusions of law." N.C. Gen.Stat. § 15A-977(f) (2015). In the present case, the trial court's order denying Defendant's motion to suppress contains no adequate conclusion of law concerning its ruling regarding the initial stop of the
 
 *610
 
 Buick by Detective O'Hal. As our Supreme Court has confirmed, it is the trial court that must make the required legal rulings in the first instance.
 
 State v. Salinas,
 

 366 N.C. 119
 
 , 123-24,
 
 729 S.E.2d 63
 
 , 66-67 (2012). When the trial court has not made all the required determinations:
 

 Remand is necessary because it is the trial court that "is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred."
 

 Id.
 

 at 124
 
 ,
 
 729 S.E.2d at 67
 
 (citation omitted);
 
 see also
 

 State v. Hughes,
 

 353 N.C. 200
 
 , 207,
 
 539 S.E.2d 625
 
 , 630-31 (2000) ("In examining the case before us, our review is limited. It is the trial judge's responsibility to make findings of fact that are supported by the evidence, and then to derive conclusions of law based on those findings of fact.") (citation omitted).
 

 In the present case, the trial court entered the following conclusion of law as its sole conclusion regarding the validity of the initial stop of the Buick:
 

 The temporary detention of a motorist upon probable cause to believe he has violated a traffic law (such as operating a vehicle with expired registration and inspection) is not inconsistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, even if a reasonable officer would not have stopped the motorist for the violation. [citation omitted] [Detective] O'Hal was justified in stopping Defendant[s'] vehicle.
 

 This conclusion consists of a statement of law, followed by the conclusion that Detective O'Hal was "justified" in initiating the stop. This conclusion does not specifically state that the stop was justified based upon any specific violation of a traffic law. This conclusion intimates that Detective O'Hal was justified in initiating the stop based upon either the alleged registration violation or the alleged inspection violation, but it does not actually make any such conclusion. This Court has reviewed a similar occurrence in
 
 State v. McFarland,
 

 234 N.C.App. 274
 
 ,
 
 758 S.E.2d 457
 
 (2014) :
 

 The "conclusions of law" in the written order were simply statements of law[.]
 

 *100
 
 Generally, a conclusion of law requires "the exercise of judgment" in making a determination, "or the application
 
 *611
 
 of legal principles" to the facts found. Not one of the "conclusions" here applied the law to the facts of this case. Although we can imagine how the facts as found by the trial court would likely fit into the legal standards recited in the section of the order which is identified as "conclusions of law," based upon the trial court's denial of the motion, it is still the trial court's responsibility to make the conclusions of law. The mandatory language of N.C. Gen.Stat. § 15A-977(f) ( "The judge must set forth in the record his findings of facts
 
 and conclusions of law.
 
 " (emphasis added)) forces us to conclude that the trial court's failure to make any conclusions of law in the record was error.
 

 "Where there is prejudicial error in the trial court involving an issue or matter not fully determined by that court, the reviewing court may remand the cause to the trial court for appropriate proceedings to determine the issue or matter without ordering a new trial."
 

 Id.
 
 at 283-84,
 
 758 S.E.2d at 464-65
 
 (citations omitted). We remand for further action consistent with this opinion, including making additional findings of fact and conclusions of law as necessary. The trial court may, in its discretion, take additional evidence in order to comply with this holding.
 
 See
 

 State v. Gabriel,
 

 192 N.C.App. 517
 
 , 523,
 
 665 S.E.2d 581
 
 , 586 (2008). If the trial court again denies Defendant's motion to suppress, Defendant's convictions stand subject to appellate review. If the trial court grants Defendant's motion to suppress, the trial court shall vacate the 14 July 2015 judgment and convictions and Defendant shall be granted a new trial on the charges of trafficking heroin by possession and trafficking heroin by transportation.
 

 IV.
 

 In the event the trial court again denies Defendant's motion to suppress, based upon Defendant's argument that Detective O'Hal improperly initiated the stop of the Buick due to registration or inspection issues, we address Defendant's additional arguments.
 

 A.
 

 Defendant argues that "the [trial] court erred by concluding reasonable suspicion [that Defendant was involved in trafficking] existed to stop the [Buick.]" We do not address the merits of this argument because the trial court made no such conclusion.
 

 *612
 
 Though the order included findings of fact that could have been relevant to a reasonable suspicion analysis on that issue, there is no discussion in the trial court's order concerning reasonable suspicion that Defendant was engaged in criminal activity; and there is no conclusion, based upon any reasonable suspicion that Defendant was trafficking illegal drugs or engaged in any other type of criminal activity, that the stop of the Buick was proper. The only discussion in the order about the basis for the stop concerned the issues related to registration and inspection status. If, upon remand, the trial court again upholds the stop of the Buick as proper, that ruling must be based upon a conclusion that there was reasonable suspicion for Officer O'Hal to believe the Buick was being operated in violation of registration or inspection statutes.
 

 B.
 

 Defendant next argues that "the [trial] court erred by denying Defendant's motion to suppress his statements made after the unconstitutional seizure." We disagree.
 

 Subsequent to the K-9 alerting for the possible presence of drugs, and Defendant and Gregory having been searched, a female officer approached Bone to search her.
 
 T91-92, 214
 
 Bone then voluntarily produced the heroin she had hidden in her pants. Detective O'Hal, who was standing near Defendant, was informed that suspected heroin had been recovered from Bone. Defendant, who apparently overheard this exchange, then stated that "[t]he dope wasn't his, it was a guy named Maurice Antonio Nichols [ ('Nichols') ] out of High Point and they were just making a drop for him." Following Defendant's statement, Defendant and Gregory were handcuffed and placed under arrest.
 

 *101
 
 The sole conclusion of law related to this issue states: "Defendant ['s] statement about [ ] Nichols and the drop for him was voluntary. There was no interrogation or functional equivalent of interrogation. [ (Citations omitted).]" The relevant findings of fact in support of the trial court's conclusion were the following:
 

 36. One of the detectives came back to the area where [Defendant] and [Gregory] were and said they had found narcotics on Bone.
 

 37. Defendant ... dropped his head, looked over at his brother Gregory and told Officer O'Hal that dope wasn't his that it was for a guy named Maurice Antonio Nichols out of High Point, and that they were making a drop for him.
 

 *613
 
 We hold these findings are supported by substantial evidence, and are sufficient to support the trial court's conclusion that Defendant's statement was voluntary and not the result of any custodial interrogation. Detective O'Hal testified that neither he, nor any other officer, asked or said anything to Defendant to elicit Defendant's statement. The evidence supports that Defendant volunteered this statement in response to an officer informing Detective O'Hal that suspected heroin had been recovered from Bone. "Spontaneous statements made by an individual while in custody are admissible despite the absence of
 
 Miranda
 
 warnings."
 
 State v. Stover,
 

 200 N.C.App. 506
 
 , 515,
 
 685 S.E.2d 127
 
 , 134 (2009) (citation and quotation marks omitted).
 

 Defendant further argues that Detective O'Hal, shortly after initiating the stop of the Buick, improperly questioned him concerning "where he was going [that day]."
 
 T83
 
 However, during the suppression hearing Defendant did not argue that this statement should be suppressed. Presumably for that reason, the trial court's order contains no conclusion of law regarding that statement. Defendant has waived appellate review of this argument.
 
 State v. Golphin,
 

 352 N.C. 364
 
 , 392-93,
 
 533 S.E.2d 168
 
 , 191 (2000) (citations omitted) ("Generally, '[t]his Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal.' "). Assuming
 
 arguendo
 
 Defendant had preserved this argument for appellate review, we hold that Defendant's argument fails.
 

 C.
 

 In Defendant's final argument, he contends that the trial court committed plain error in failing to
 
 sua sponte
 
 exclude certain testimony of Defendant's witness, Mercedes Washington ("Washington"). Assuming
 
 arguendo
 
 the challenged testimony of Washington constituted error, we have thoroughly reviewed the record, and hold that Defendant fails to demonstrate "that, absent the error, the jury probably would have returned a different verdict."
 
 State v. Lawrence,
 

 365 N.C. 506
 
 , 519,
 
 723 S.E.2d 326
 
 , 335 (2012). This argument is without merit.
 

 NO ERROR IN PART; REVERSED AND REMANDED IN PART.
 

 Judges STEPHENS and DAVIS concur.
 

 [1]
 

 Even if the Buick had been inspected after 30 September 2014, but before the stop on 6 October 2014, it would still have been being operating legally as far as its inspection status was concerned.