IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-903

No. COA21-786

Filed 29 December 2022

Union County, No. 20 CRS 50474

STATE OF NORTH CAROLINA

v.

LUIS ERNESTO AGUILAR, Defendant.

Appeal by Defendant from judgment entered 1 June 2021 by Judge Nathan H. Gwyn III in Union County Superior Court. Heard in the Court of Appeals 8 June 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Scott T. Slusser, for the State.*

*Gilda C. Rodriguez for defendant.*

MURPHY, Judge.

¶ 1 Our review of a denial of a motion to suppress is strictly limited to determining whether the trial court's underlying findings of fact are supported by competent evidence, in which case they are conclusively binding on appeal, and whether those factual findings in turn support the court's ultimate conclusions of law. We affirm the trial court's denial of Defendant's motion to suppress.

**BACKGROUND**

¶ 2    Defendant Ernesto Luis Aguilar appeals from his convictions, pursuant to a plea agreement, for trafficking by possession and transportation heroin that was 14 grams or more but less than 28 grams.  On appeal, Defendant contends the trial court erred by denying his motion to suppress because officers lacked probable cause as required to justify the warrantless search of his vehicle.

¶ 3    On the morning of 29 January 2020, Lieutenant Ben Baker with the Union County Sheriff's Office received information from an informant, confidential source of information #1 ("CSI #1"),[1] known to have provided reliable tips in past illegal narcotics investigations.  This information was a particularized tip that Robert Storc, who was under investigation for the sale of narcotics, would later that day be driving his dark colored Honda Accord and purchasing heroin from a supplier at a specified location, which was later changed to the Burger King parking lot in Monroe.

¶ 4    Later on 29 January 2020, members of the Union County Sheriff's Office and Monroe Police Department were conducting surveillance on Storc regarding the tip.  Detective Ian Gross of the Union County Sheriff's Office watched Storc from the parking lot of a Buffalo Wild Wings in Monroe, which was across the street from the Burger King.  Set up just across Highway 74 and equipped with binoculars, Detective

---

[1] There are two confidential sources of information that provided tips to officers here: (1) CSI #1, who provided information regarding Robert Storc; and (2) confidential source of information #2 ("CSI #2"), who provided information regarding Mike Moreno, allegedly a local drug dealer with which the investigators were previously familiar.

Gross had a clear line of sight of Storc and other vehicles at Burger King. Around noon, Detective Gross observed Storc drive around the Burger King parking lot several times, park in different spots, and settle on a spot in the west side of the lot. Approximately five to ten minutes later, a grey Honda Accord, which Detective Gross believed to be either a 2010 or 2012 model based on previously owning a similar vehicle, parked near Storc. Detective Gross testified that the grey Honda Accord was driven by a "white or Hispanic male" with "short or bald hair" and that the vehicle had a paper license tag with plastic factory rims. Detective Gross claims Storc walked over to the grey Honda Accord, talked with the driver for a couple minutes, and returned to his vehicle. Detective Gross did not see Storc return to his own Honda Accord with anything in his hands.

¶ 5     Neither Storc nor the driver of the grey Honda were seen entering the Burger King and, shortly after the encounter, they left the parking lot separately and traveled westbound on Highway 74. Officers lost track of the grey Honda Accord but followed Storc to the parking lot of the Target approximately two miles down Highway 74 in Monroe and took Storc into custody where they found "a golf ball size" of what appeared to be heroin in his pocket. Storc allegedly then admitted who supplied him the heroin. Detective Brantley Birchmore of the Monroe Police Department, who was assisting in the investigation, claimed Storc said he just got the heroin from a man at a Burger King driving a grey Honda, but the supplements

Detective Birchmore wrote following Storc's arrest did not include such an admission.

¶ 6 Seemingly coincidentally, as Storc was being taken into custody, CSI #2 told Detective Daniel Stroud of the Union County Sheriff's Office that Mike Moreno, a drug dealer known to law enforcement in Monroe, was about to purchase heroin at his house from someone driving a grey Honda Accord with a South Carolina paper tag. After receiving the information, some of the officers left the Target parking lot and drove to Moreno's house, which was about four to five miles or seven to ten minutes away. From the parking lot of a nearby funeral home, Detective Gross observed Moreno's house for approximately three to five minutes before he noticed a grey Honda Accord with a paper tag parking in front of the house, and he communicated over police radio that he believed it to be the same vehicle that he had seen in the Burger King parking lot. Detective Gross then saw a white or Hispanic male leave the house and walk towards the grey Honda.

¶ 7 When the grey Honda drove away, officers followed it to the Fiesta Mart where they stopped the vehicle and found Defendant, a light-skinned bald Hispanic male, as the driver. The canine unit on scene conducted a sniff search around the grey Honda but did not alert on the car. However, based on the totality of the circumstances, such as the tips provided by two unrelated confidential informants and officers' observations that confirmed these specific tips, officers believed they had probable cause and proceeded to search the vehicle. Defendant was then arrested

after officers found heroin while searching the car.

On 1 June 2020, the Union County Grand Jury indicted Defendant for trafficking by possession and transportation 28 grams or more of heroin. Defendant moved to suppress the evidence found during the search of his vehicle on the basis that officers lacked probable cause. Defendant's *Motion to Suppress* was heard at the 8 March 2021 Criminal Session of Union County Superior Court. On 18 March 2021, the trial court announced its decision to deny the motion, and Defendant gave notice of his intention to appeal. The trial court's written order denying Defendant's *Motion to Suppress* was signed 18 March 2021 and entered 1 April 2021.

On 1 June 2021, a superseding charging document was filed in which Defendant was charged by information of trafficking by possession and transportation heroin that was 14 grams or more but less than 28 grams. Although expressly reserving the right to appeal the suppression order, Defendant pleaded guilty to both charges at the 1 June 2021 Criminal Session of Union County Superior Court. The trial court entered a *Judgement and Commitment Order* and sentenced Defendant to a consolidated active sentence of 90 to 120 months. Defendant timely appeals. *See* N.C.G.S. § 7A-27(b) (2021); N.C.G.S. § 15A-979(b) (2021); N.C.G.S. § 15A-1444(a2) (2021).

## ANALYSIS

Defendant urges us to reverse the trial court's denial of his *Motion to Suppress*

on the basis that officers lacked probable cause to search his vehicle.

¶ 11      Our review of the "denial of a motion to suppress 'is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.'" *State v. Tripp*, 381 N.C. 617, 2022-NCSC-78, ¶ 12 (quoting *State v. Cooke*, 306 N.C. 132, 134 (1982)). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." *State v. Ashworth*, 248 N.C. App. 649, 651 (citation and marks omitted), *disc. rev. denied*, 369 N.C. 190 (2016). "Findings of fact not challenged on appeal 'are deemed to be supported by competent evidence and are binding on appeal.'" *Tripp*, 2022-NCSC-78 at ¶ 12 (quoting *State v. Biber*, 365 N.C. 162, 168 (2011)). "Even when challenged, a trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *Id.* (quoting *State v. Buchanan*, 353 N.C. 332, 336 (2001) (citation omitted)). Meanwhile, "'[c]onclusions of law are reviewed de novo and are subject to full review.'" *Id.* at ¶ 13 (quoting *Biber*, 365 N.C. at 168).

## A. Findings of Fact

¶ 12      Defendant challenges only two of the trial court's 28 findings of fact. Specifically, Defendant contends Finding 6 and Finding 15 are not supported by competent evidence. The trial court's remaining findings of fact are not challenged

and therefore are deemed to be supported by competent evidence and binding on appeal. *See id.* at ¶ 12 (quoting *Biber*, 365 N.C. at 168). We review Defendant's challenges to Findings 6 and 15 below.

**1. Finding of Fact 6**

Finding 6 reads,

> That approximately five to [ten] minutes after Storc's Honda parked, a grey Honda Accord, 2011 or 2012 model, with factory plastic rims, and no window tint driven by a white or Hispanic male, short hair or bald, pulled into the Burger King parking lot and parked on the same west side parking lot at Burger King.

Defendant claims the finding is not supported by competent evidence because "Gross did not have a clear view of the driver of the grey Honda as the trial court's finding implied" and thus the finding "erroneously portrayed what Gross was able to see while he was parked across the street from the Burger King." Defendant points to the fact that Detective Gross "testified that he 'could not make that person out at the time.'" According to Defendant, "Gross reiterated that he could not see the driver while surveilling the Burger King when he testified that he 'could[] [not] see into [the grey Honda] but [he] could see that the driver was still seated in the driver's seat.'" Defendant contends that "[e]xactly when Gross was able to see the driver of the grey Honda that was at the Burger King parking lot was not revealed in his testimony or the supplemental report he completed for this case."

¶ 14     In response, the State argues, "[t]here was competent evidence that Detective Gross could make out the physical features of the driver of the grey Honda." According to the State, Detective Gross "could clearly make out the physical features of the driver as a white or Hispanic male with short or bald hair, but did not know the actual identity of the driver." The State thus contends, "[t]he fact that the Detective did not know the identity of the driver does not negate competent evidence that he could see the driver's physical features that ultimately matched Defendant's appearance." We agree with the State.

¶ 15     The Record reveals that Finding 6 is supported by competent evidence. As Defendant notes, Finding 6 was based on the testimony of Detective Gross, a detective with the Union County Sheriff's Office who claimed to have participated in and made arrests in "probably 100 or more" narcotics investigations. The testimony relevant to Finding 6 is reproduced below:

> [DETECTIVE GROSS:] So that day I observed the black Honda that was driven by Mr. Stor[c] circle the building several times, park in different spots and finally came to rest on the west side of that parking lot, of the Burger King parking lot.
>
> [THE STATE:] Was -- so you said he was moving around, driving around. Was that significant to you?
>
> [DETECTIVE GROSS:] It was.
>
> [THE STATE:] Why?
>
> [DETECTIVE GROSS:] So typically with any kind of drug

transaction that we've witnessed and that I've been a part of the person that's purchasing the narcotics will move around in order to see who's following them. Sometimes it's just out of pure nervousness, but they will move around. But typically somebody that goes to a restaurant or anywhere, they go there, they park, they go in, they come out. It's not something that they normally do.

[THE STATE:] Now, just a little bit more about that day in particular. About what time of day was this?

[DETECTIVE GROSS:] It was approximately noon.

[THE STATE:] Can you describe the weather conditions for that day?

[DETECTIVE GROSS:] It was clear, no rain.

[THE STATE:] Okay. And you stated you were across the street. Were you able to see with your own eyes?

[DETECTIVE GROSS:] No. I had to -- I could see the parking lot but in order to see everything clearly I used a set of binoculars.

[THE STATE:] Okay. And so tell me exactly what you saw in regards to Robert Stor[c] in that Burger King.

[DETECTIVE GROSS:] So after the vehicle parked on the west side of the lot, I don't recall exactly how many, maybe 5 to 10 minutes another vehicle, a gr[e]y in color Honda Accord, maybe a 2010, 2012 model pulled up on the same side of the parking lot, parked, and was driven by a white or Hispanic male. I could not make that person out at the time. At that time I watched Mr. Stor[c] get out of his vehicle and go to the driver's side of the gr[e]y Honda.

[THE STATE:] Okay. And then what happened when he went to the driver's side of the gr[e]y Honda?

[DETECTIVE GROSS:] Mr. Stor[c] stopped and talked

with the driver approximately a minute, maybe two, and then went back to his vehicle.

[THE STATE:] Okay. Can you describe the -- well, first of all, was there anything about that interaction that stood out to you?

[DETECTIVE GROSS:] Just the fact that there was a meeting in a parking lot of obviously the target of that investigation, Mr. Stor[c], for a brief amount of time, which is consistent with a drug transaction.

[THE STATE:] Now, could you see what was going on within the gr[e]y Honda Accord that had pulled up beside Robert Stor[c]'s black Honda Accord?

[DETECTIVE GROSS:] I couldn't see into it but I could see that the driver was still seated in the driver's seat.

[THE STATE:] And you said that you -- you said that the driver was either a white or Hispanic male, but could you make out any other discerning characteristics about him?

[DETECTIVE GROSS:] Just short or bald hair.

[THE STATE:] Now, can you also further describe that gr[e]y Honda Accord that Stor[c] got into or went up to at the Burger King?

[DETECTIVE GROSS:] Yes. So like I said, again, I think it was a 2010 or 2012 model, somewhere about there.

[THE STATE:] How do you know that?

[DETECTIVE GROSS:] The reason I say that is I actually owned one of those –

[THE STATE:] Okay.

[DETECTIVE GROSS:] -- previously, so --

[THE STATE:] I'm sorry.  Go ahead and describe the car.

[DETECTIVE GROSS:] So the vehicle had the plastic rims and stood out.  You know, the -- I couldn't tell from that point what the tag was, just because I couldn't see the tag on the vehicle as it was parked there.

[THE STATE:] Could you tell if it was like a paper tag or like a metal tag?

[DETECTIVE GROSS:] So I was able to tell that it was a paper tag once both parties separated and the vehicles left the parking lot.

[THE STATE:] Were you able to see the numbers on the paper tag?

[DETECTIVE GROSS]: No, ma'am.

[THE STATE:] Okay.  Also about that car, did it have like dark tinted windows?

[DETECTIVE GROSS:] No.  The windows were clear.

Detective Gross's testimony of what he observed at the Burger King is consistent with Finding 6 because Gross could make out the characteristics of the grey Honda Accord—that it was an early-2010's model with factory plastic rims and no window tint—and features of the driver—that he was white or Hispanic with bald or short hair—as he entered the parking lot about five to ten minutes after Storc's Honda Accord parked there.  That Detective Gross could not make out the *identity* of the driver of the grey Honda Accord as someone with which he was familiar in his narcotics investigations does not mean his testimony describing the vehicle and

driver's features was not competent evidence, as Detective Gross was clear and direct about the limited features of the driver he observed. Furthermore, to the extent that Defendant challenges Finding 6 based on the argument that it "implied" Detective Gross had a "clear view" of the driver in the grey Honda Accord, we are unpersuaded because neither the "clear view" language or anything like it appears in Finding 6. Even if Defendant is correct that Detective Gross did not have a clear view and could not see into the grey Honda Accord once it parked in the Burger King parking lot, challenged findings of fact "'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *Tripp*, 2022-NCSC-78 at ¶ 12 (quoting *Buchanan*, 353 N.C. at 336). We therefore conclude Finding 6 is supported by competent evidence and binding on appeal because a reasonable mind might accept Detective Gross's testimony as adequate to support the finding. *See Ashworth*, 248 N.C. App. at 651.

**2. Finding of Fact 15**

¶ 16    Finding 15 reads, "[t]hat while standing in the parking lot of [Target] Storc told Birchmore that he got the dope from a guy at the Burger King." Defendant claims the finding is not supported by competent evidence because "[i]t was not until a year later, in preparation for the motion to suppress hearing, that Birchmore communicated [] Storc's admission to the prosecutor handling [Defendant's] case" and "Birchmore's belated recollection of Storc's admission was not supported by the

documentation Birchmore produced while the events were fresh in his mind a year earlier . . . ." We are not convinced.

¶ 17      The Record reveals that Finding 15 is supported by competent evidence. Detective Birchmore testified that he is a detective with the Monroe Police Department who has participated in and made arrests in 50 to 100 narcotics investigations.      Finding 15 is entirely consistent with Detective Birchmore's testimony during the hearing.  Although the supplements that Detective Birchmore prepared did not mention that Storc "got the dope from a guy at the Burger King," Detective Birchmore testified at the hearing that he knew Storc "had made a comment about meeting a male at Burger King to receive dope, which ended up being heroin[,]" but that he "could[] [not] remember exactly how [Storc] worded it."  We therefore conclude Finding 15 is supported by competent evidence and binding on appeal because a reasonable mind might accept Detective Birchmore's testimony as adequate to support the finding, despite Detective Birchmore not including Storc's incriminating statement in the supplements he prepared after Storc and Defendant's arrests.  *See Ashworth*, 248 N.C. App. at 651.  That Detective Birchmore did not include Storc's statement in his supplements goes, at most, to the credibility of Detective Birchmore and the weight of his testimony—determinations reserved for the trial court.  *See State v. Fields*, 268 N.C. App. 561, 568 (2019) (citations and marks omitted) ("[T]he trial court determines the credibility of the witnesses, the weight to

be given to the testimony, and the reasonable inferences to be drawn therefrom. If different inferences may be drawn from the evidence, the trial court determines which inferences shall be drawn and which shall be rejected.").

## B. Conclusions of Law

¶ 18      Defendant also argues that these findings do not support the trial court's ultimate conclusion of law that officers had probable cause to search his vehicle. Additionally, Defendant argues that "the trial court erred by failing to provide its rationale in the conclusions of law for denying the motion to suppress." Defendant relies heavily on *State v. Faulk*, 256 N.C. App. 255 (2017), as he claims, "[i]n this case, like in *Faulk*, the trial court only had one relevant conclusion of law and did not provide its rationale for denying [Defendant's] motion to suppress—neither from the bench nor in the suppression order." Citing *State v. Baskins*, 247 N.C. App. 603 (2016), Defendant requests that "this case [] be remanded for conclusions of law that provide a rationale for the trial court's ruling on [Defendant's] motion to suppress."

¶ 19      At the outset, we first address whether the trial court erred by allegedly failing to provide a rationale for its ruling with the single conclusion of law in the order denying Defendant's *Motion to Suppress*, as such an error would require that we remand to allow the trial court to make additional findings of fact and conclusions of law. *See, e.g.*, *State v. McFarland*, 234 N.C. App. 274, 284-85 (2014) ("[T]he trial court failed to make adequate conclusions of law to justify its decision to deny [the]

defendant's motion to suppress . . . . Therefore, we must remand to allow the trial court to make appropriate conclusions of law based upon the findings of fact."); *see also State v. Neal*, 210 N.C. App. 645, 656 (2011) (citation and marks omitted) ("Where there is prejudicial error in the trial court involving an issue or matter not fully determined by that court, the reviewing court may remand the cause to the trial court for the appropriate proceedings to determine the issue or matter without ordering a new trial."). We are not persuaded that the trial court failed to provide a rationale for denying Defendant's *Motion to Suppress*.

¶ 20      In *Faulk*, we concisely explained the trial court's duty to set forth findings of fact and conclusions of law when ruling on a motion to suppress:

> When ruling on a motion to suppress following a hearing, "[t]he judge must set forth in the record his findings of facts and conclusions of law." [N.C.G.S.] § 15A-977(f) (2015). While this statute has been interpreted by the North Carolina Supreme Court to require findings of fact "only when there is a material conflict in the evidence[,]" *State v. Bartlett*, 368 N.C. 309, 312 . . . (2015), our Court has explained that "it is still the trial court's responsibility to make the conclusions of law." [*McFarland*, 234 N.C. App. at 284].
>
> "Generally, a conclusion of law requires 'the exercise of judgment' in making a determination, 'or the application of legal principles' to the facts found." [] *McFarland*, 234 N.C. App. at 284 . . . (quoting *Sheffer v. Rardin*, 208 N.C. App. 620, 624 . . . (2010)). When a trial court fails to make all the necessary determinations, *i.e.*, findings of fact resolving disputed issues of fact and conclusions of law applying the legal principles to the facts found, "[r]emand

> is necessary because it is the trial court that is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, *and, then based upon those findings, render a legal decision, in the first instance*, as to whether or not a constitutional violation of some kind has occurred." [*Baskins*, 247 N.C. App. at 610] (emphasis added) (internal [] marks and citation omitted); *see also State v. Salinas*, 366 N.C. 119, 124 . . . (2012) (holding that remand was necessary for additional findings of fact that resolved the conflicts in evidence).

*Faulk*, 256 N.C. App. at 262-63; *see* N.C.G.S. § 15A-977(f) (2021). Relying on our review of "a similar order denying a defendant's motion to suppress" in *Baskins*, we remanded *Faulk* to the trial court to "make necessary conclusions of law concerning [the] [d]efendant's motions to suppress." *See Faulk*, 256 N.C. App. at 263, 265 (citing *Baskins*, 247 N.C. App. at 609-11). The *Baskins* written order contained the following sole conclusion of law regarding the validity of the traffic stop:

> The temporary detention of a motorist upon probable cause to believe he has violated a traffic law (such as operating a vehicle with expired registration and inspection) is not inconsistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, even if a reasonable officer would not have stopped the motorist for the violation. [citation omitted] [Detective] O'Hal was justified in stopping [the] [d]efendant['s] vehicle.

*Baskins*, 247 N.C. App. at 610. We explained in *Baskins* that "[t]his conclusion consists of a statement of law, followed by the conclusion that Detective O'Hal was 'justified' in initiating the stop" and that "does not specifically state that the stop was justified based upon any specific violation of a traffic law." *Id.* Citing *McFarland*,

234 N.C. App. at 283-84, we held that this sole conclusion of law did not make any conclusion about whether "Detective O'Hal was justified in initiating the stop based upon either the alleged registration violation or the alleged inspection violation . . . ." *Baskins*, 247 N.C. App. at 610-11.

Similarly, in *Faulk*, the order's sole conclusion of law stated, in its entirety,

> [t]hat [N.C.G.S. §] 15A-401(E) was not applicable to the arrest of [the defendant] in the State of Maryland and the arrest and subsequent search was not a violation of the Fourth and Fourteenth Amendments of the United States Constitution, therefore, the motion to suppress filed by the [d]efendant in this matter on [5 July 2016] is hereby denied.

*Faulk*, 256 N.C. App. at 264. Employing slightly different reasoning than we did in *Baskins*, we explained in *Faulk*, "[w]hile the undisputed evidence and facts found by the trial court support the denial of the motion, the order lacks any conclusion applying legal principles to those facts, *i.e.*, it omits an appropriate determination in the first instance" as to "why [the] [d]efendant's warrantless arrest while in a private home . . . did not violate [the] [d]efendant's Fourth and Fourteenth Amendment rights." *Id.* We also found, as to the defendant's later filed motion to suppress, that "[b]ecause the evidence relevant to the search warrant was undisputed, the trial court was not required to make findings of fact to support its denial of the 14 July 2016 motion." *Id.* at 265. However, even though findings were not required, we held "the trial court's failure to provide its rationale from the bench, coupled with the omission

of *any* mention of the motion challenging the search warrant, preclude[d] meaningful appellate review of that ruling." *Id.* (emphasis added). We emphasized that it "is the trial court's duty to apply legal principles to the facts, even when they are disputed." *Id.*

¶ 22        Defendant claims the case *sub judice* is like *Faulk* because "the trial court only had one relevant conclusion of law and did not provide its rationale for denying [his] motion to suppress[.]" We disagree. Here, the trial court's statements from the bench during the hearing on Defendant's *Motion to Suppress* and during a later session of open court on 18 March 2021, coupled with the relevant conclusion of law in the written order entered 1 April 2021, provided the court's rationale for denying the motion.

¶ 23        Notably, on appeal, Defendant completely ignores the trial court's statements from the bench during the 11 March 2021 hearing. These statements inform the trial court's later statements on 18 March 2021 that Defendant selectively quotes in his brief to suggest the trial court did not provide the rationale for its ruling.

¶ 24        Specifically, after allowing the parties to present arguments and evidence at the suppression hearing, as memorialized in a transcript over 100 pages in length, the trial court noted that it would "take it all under advisement" and "probably do [its] own research" before ruling on Defendant's *Motion to Suppress*. The State argued at the hearing that "[t]he canine didn't alert. But it did[] [not] even matter

because we had so much other information that gave them probable cause to believe that [] Defendant had drugs within that car." The trial court made clear that its focus was on whether the caselaw has held that a negative canine hit on a vehicle means officers lacked probable cause to search despite other facts and circumstances to the contrary. This is shown in the exchange between Defendant's counsel and the State at the end of the hearing.

¶ 25        Answering Defendant's counsel's contention that "the facts of the dog not alerting is not in either one of th[e] cases" the State relied on during the hearing, the State explained, "I looked for a case like that. There's not a case because I believe if you've got probable cause, you've got probable cause." Defendant's counsel quickly replied, "I would argue that the fact that we can't find a case where the drug dog did not alert and they still searched illustrates there was no probable cause and most every other officer would know that there's no probable cause to search the car." The trial court then indicated it would review the cases cited by the parties and would "probably do [its] own research . . . ." The State then stated that it "wasn't able to find a case [saying] that the absence of a dog alert negates any other probable cause" and that "just because the dog did[] [not] alert does[] [not] negate all the other probable cause that they had." Defendant's counsel had the last word at the hearing, seeming to suggest that the lack of a positive canine hit necessarily compels the conclusion that officers did not have probable cause. Given this lengthy exchange on

the issue raised by Defendant's *Motion to Suppress*, our search for the rationale for the trial court's ruling as announced in open court on 18 March 2021 and explained by written order entered 1 April 2021 cannot be complete without considering the context of what was said during the suppression hearing. These statements show the ruling was that officers had probable cause based on the totality of the circumstances—as laid out in four pages of findings—despite the canine failing to alert during a sniff search of the vehicle.

¶ 26      Furthermore, the statement announcing the denial of Defendant's *Motion to Suppress*—when considered in its entirety—shows the court exercised its judgment and applied the totality of the circumstances test for probable cause:

> The Court's going to deny your motion, but I do want to put this on the record, that the Court struggled with the fact that the dog didn't hit on the car. And I don't mean this sarcastic or any ill will toward the Government, but when a dog has a positive alert it's the gospel we're supposed to take and it's the gospel. And when the dog has a negative alert, we're supposed to -- it seems like we're supposed to ignore that. But based on everything, the totality of everything I would have had to -- the not hitting would have had to outweigh all the other stuff based on -- based on the cases I've read there was nothing on point, obviously y'all know. But the appellate court, where you like it or not, they are very lenient toward these dogs and their behaviors, whether it's issues or positives and nothing's found. So that's the Court's ruling. But I want you -- I wanted it to be on the record the things that I had problems with.

The trial court clearly explained the rationale for why it denied Defendant's *Motion*

*to Suppress* concerning evidence officers found after searching the vehicle because the court exercised its judgment in applying the law to the facts and concluding that "based on . . . the totality of everything . . . the [canine] not hitting [did not] outweigh all the other stuff . . . ." These statements from the bench were confirmed by order entered 1 April 2021.

In that order, the trial court made 28 findings of fact that described the totality of circumstances on which the court based its decision and that we held *supra* are binding on appeal:

> 1. That on [29 January 2020] Detective Ben Baker ("Baker"), Detective Ian Gross ("Gross"), Detective Jonathan Presson ("Presson"), and Detective Jason Stroud ("Stroud"), all with the Union County Sheriff's [Office] Narcotics Division and Detective Brantley Birchmore ("Birchmore") with the Monroe Police Department Narcotics Unit, conducted a drug interdiction surveillance operation at Burger King located on Highway 74 and Secrest Shortcut Road in Monroe, Union County, North Carolina ("Burger King"). All members involved in the drug interdiction surveillance operation each had years of experience and many hours training in narcotics investigations.
>
> 2. That Baker received information from a confidential source of information (CSI #1) that Robert Storc would be driving his dark colored Honda Accord and meeting a heroin source of supply at the Burger King, and this information was conveyed to all members involved in the drug interdiction surveillance operation.
>
> 3. That the CSI #1 was a reliable source of information in that they had given Baker reliable information regarding

drug investigations many times over the years. That the CSI was a career informant, whose information led police to make many arrests over fifteen years at the local and federal level.

4. That on [29 January 2020] at approximately 12:00pm, Gross parked his gold Chrysler minivan at the Buffalo Wild Wings located on Hwy 74 across from the Burger King, where he was able to see the parking lot area of the Burger King and used binoculars to see more clearly [the] vehicles in the parking lot[.]

5. That Gross observed a black Honda Accord driven by Robert Storc circle the Burger King parking lot several times, park in different spots, and finally park in a spot to the west side of the parking lot at Burger King.

6. That approximately five to [ten] minutes after Storc's Honda parked, a grey Honda Accord, 2011 or 2012 model, with factory plastic rims, and no window tint driven by a white or Hispanic male, short hair or bald, pulled into the Burger King parking lot and parked on the same west side parking lot at Burger King.

7. That Storc got out of his vehicle and went to the driver's side of the grey Honda Accord, spoke to the male driver for approximately one to two minutes and then returned to his vehicle. Gross did not notice anything in Storc's hands.

8. That neither Storc nor the male driver of the grey Honda Accord went inside Burger King or went through the drive-thru at Burger King. That the male driver of the grey Honda Accord never exited his vehicle at the Burger King.

9. That based on Gross's training and experience, the CSI #1 information, he opined that a drug transaction had occurred between Storc and the driver of the grey Honda Accord in the parking lot of Burger King.

10. That both Storc's vehicle and the grey Honda Accord

left the parking lot of Burger King and traveled westbound on Highway 47 and Gross relayed that information to all Detectives involved in the drug interdiction surveillance via police radio.

11. That Gross noticed when the grey Honda Accord left the Burger King parking lot, a paper license tag was on the grey Honda Accord.

12. That the other officers involved in the surveillance followed both Storc's vehicle and the grey Honda Accord, but lost the grey Honda Accord in traffic.

13. That officers followed Storc's vehicle into the parking lot of Target located on Highway 74, approximately two and [a] half miles from the Burger King, where Storc backed into a parking space in front of Rack Room Shoes adjacent to Target.

14. That Storc was removed from the vehicle, patted down and arrested by Birchmore. Approximately nine to [ten] grams of a substance believed to be heroin was located in the front right pocket of Storc's jeans.

15. That while standing in the parking lot of Target/Rack Room Shoes Storc told Birchmore that he got the dope from a guy at the Burger King.

16. That while in the parking lot of Target/Rack Room Shoes, Stroud received information from an independent confidential source of information (CSI #2) that was not involved in the investigation to this point, that a source of supply of heroin which was driving a grey Honda Accord with a South Carolina paper tag was delivering heroin to Michael Marino, known to law enforcement as Mike Mike, at Marino's residence located on West Park Drive in Monroe, which was approximately four to five miles and approximately seven to ten minute drive from the Target parking lot. Marino was known to law enforcement as a heroin drug trafficker due to many dealings with him in

the past, and law enforcement where he lived due to previous surveillance of his residence.

17. That CSI #2 was reliable in that Stroud had used this confidential source of information approximately twenty to thirty times and those times Stroud had found him/her to be reliable.

18. That Gross went to Marino's residence located on West Park Drive, and parked in the back parking lot of a funeral home located next to West Park Drive, where he was able to view Marino's residence.

19. That Gross noticed the same grey Honda Accord with a paper license tag that he had seen in the parking lot of Burger King approximately fifteen to twenty minutes earlier, parked in front of Marino's residence, along with Marino's black Chrysler 300 parked in front of the residence.

20. That Gross saw a white or Hispanic male leave Marino's residence and walk toward the grey Honda Accord parked in front of Marino's residence, "either get into the driver's seat or go near the vehicle".

21. That approximately three to five minutes after Goss arrived at Marino's residence, the grey Honda Accord left Marino's residence and traveled toward Franklin Street.

22. That Stroud also went to Marino's residence located on West Park Drive, an approximate 10-minute drive from the Target/Rack Room Shoes parking lot on Elizabeth Avenue, which is across the street from Marino's residence.

23. That Stroud noticed a grey Honda Accord parked in front of Marino's residence and shortly after Stroud's arrival on Elizabeth Avenue, the grey Honda Accord left, turning on Elizabeth Avenue heading toward Franklin Street. That Stroud used binoculars and saw the driver ([the] only occupant of the vehicle) of the grey Honda

Accord, stocky build Hispanic male, clean shaven, broad jaw, wearing a dark shirt and a black toboggan.

24. That Gross, Stroud and several other officers involved in the drug interdiction surveillance followed the grey Honda Accord, where it traveled on Franklin Street, turned right on Morgan Mill Road and continued to travel on Walk Up to the area of Riverside Drive or Castle Drive, Monroe, and then turned left onto Castle Drive and immediate right into the parking lot of Fiesta Mart, and parked on the south side of the parking lot beside the building.

25. That the area where Fiesta Mart is located is a known drug trafficking area, that Monroe Police Department has worked several drug cases and surveillance in that area.

26. That the vehicle was stopped and the driver removed from the vehicle. That the driver did not say anything and appeared "very stoic and calm".

27. That Presson conducted an air sniff around the grey Honda Accord with his [canine], [which] . . . did not alert on the grey Honda Accord.

28. That Gross, Birchmore and Stroud identified the person that was removed from the grey Honda Accord as [Defendant]. That [] [D]efendant is a light skinned, bald Hispanic male.

Based on its findings of fact, the trial court made the following conclusions of law:

1. This matter is properly before the Court; and the Court has jurisdiction over the respective parties and over the subject matter of this action.

2. Based upon a totality of the circumstances the Court concludes that [] Defendant's motion to suppress for lack of probable cause be denied.

These conclusions of law and findings of fact, along with the trial court's statements

during the hearing on 11 March 2021 and during the announcement of the denial of Defendant's *Motion to Suppress* on 18 March 2021, sufficiently explain the court's rationale in resolving the sole issue implicated by the motion and addressed at the suppression hearing: whether officers had probable cause to search Defendant's vehicle based on the totality of the circumstances. This separates the case *sub judice* from *Baskins* and *Faulk*.

¶ 28        Unlike in *Baskins*, where the trial court intimated that its denial of the defendant's motion to suppress challenging the basis for his traffic stop was due to officers observing the defendant commit a traffic violation but did not indicate the particular alleged violation that justified the stop, here the trial court indicated that, despite the negative canine hit, observations from surveilling officers and information from reliable confidential sources were sufficient to establish probable cause to search Defendant's vehicle. Our decision in *Faulk* that remanded due to the sole conclusion of law in the order stated that neither a particular statutory provision nor the defendant's constitutional rights were violated is likewise distinguishable because the trial court here explained that probable cause supported the search based upon the totality of the circumstances in the findings. As such, we hold that appellate review of the order is indeed possible and no remand is necessary. We therefore consider whether the trial court's findings of fact support its ultimate conclusion of law that officers had probable cause to search Defendant's vehicle based upon the

totality of the circumstances. *See Tripp*, 2022-NCSC-78 at ¶ 12.

¶ 29        "The Fourth Amendment [to] the United States Constitution and Article [I], Section 20 of the North Carolina Constitution prohibit unreasonable searches and seizures." *State v. Parker*, 277 N.C. App. 531, 2021-NCCOA-217, ¶ 25 (citation and marks omitted), *disc. rev. denied*, 860 S.E.2d 917 (Mem) (2021). "Typically, a warrant is required to conduct a search unless a specific exception applies." *Id.* (citation and marks omitted). "For example, the motor vehicle exception provides that the search of a vehicle on a public roadway or public vehicular area is properly conducted without a warrant as long as probable cause exists for the search." *Id.* (citation and marks omitted). "Probable cause is generally defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty of an unlawful act." *Id.* (citation and marks omitted)). In the context of the motor vehicle exception,

> [a] police officer in the exercise of his duties may search an automobile without a search warrant when the existing facts and circumstances are sufficient to support a reasonable belief that the automobile carries contraband materials. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

*State v. Degraphenreed*, 261 N.C. App. 235, 241 (2018) (citation and marks omitted).

¶ 30        Defendant challenges the trial court's ultimate conclusion of law by arguing

that, "[i]n the absence of a positive alert from the [canine], there was no probable cause to search the vehicle." As such, we must determine whether the conclusion that there was probable cause—based on the then-existing facts and circumstances being sufficient to support a reasonable belief that Defendant's vehicle carried contraband materials—is supported by trial court's findings of fact. *See id.*; *Tripp*, 2022-NCSC-78 at ¶ 12. "The existence of probable cause is a commonsense, practical question that should be answered using a totality-of-the-circumstances approach." *State v. McKinney*, 361 N.C. 53, 62 (2006) (citation and marks omitted).

¶ 31        Here, the binding findings of fact reveal several circumstances that, even in the absence of a positive alert from the canine, support a reasonable belief that Defendant's vehicle carried contraband materials. The evidence showed (i) a credible confidential source provided reliable information that Storc was going to the Burger King to get heroin; (ii) Storc met a grey Honda with paper tags driven by a man matching Defendant's description at the Burger King parking lot; (iii) neither Storc nor the other driver went into Burger King and instead had a one to two minute interaction in the car that Detective Gross testified as being consistent with a drug transaction; (iv) when law enforcement stopped Storc shortly after leaving Burger King, they found heroin in his pocket; (v) at the same time, another credible confidential source provided reliable information that Moreno, a known drug trafficker, was being supplied with heroin by a male in a grey Honda with paper tags;

(vi) law enforcement immediately went to Moreno's house and saw what they believed to be the same grey Honda with paper tags parked that was driven by the same white or Hispanic man they saw at Burger King;  (vii) law enforcement followed and stopped the grey Honda driven by Defendant, which was the same vehicle at the Burger King and Moreno's house; and (viii) Defendant is a bald Hispanic male.  Based on these facts regarding reliable information from confidential sources confirmed by observations of experienced narcotics investigators, it was objectively reasonable to believe that Defendant's vehicle contained contraband materials such as the heroin found on Storc.

Furthermore, Defendant has cited no case, either before the trial court or on appeal, holding that officers *cannot* have probable cause to search a vehicle if a canine search is conducted and the canine fails to alert.  Nor did we find such a case. Defendant cites cases that found probable cause existed where there was a positive alert for narcotics by a specially trained canine, *see, e.g.*, *State v. Washburn*, 201 N.C. App. 93, 100 (2009), *disc. rev. denied*, 363 N.C. 811 (2010), but the only case Defendant cites mentioning a failure to alert is a United States Supreme Court case that simply mentioned the reality in policing that "[i]f a dog on patrol fails to alert to a car containing drugs, the mistake *usually* will go undetected because the officer will not initiate a search."  *Florida v. Harris*, 568 U.S. 237, 245 (2013) (emphasis added). Indeed, this statement seems to imply that officers occasionally *do* search a vehicle

after a canine fails to alert, seemingly based on other circumstances. *Id.*

Nevertheless, whether probable cause existed is a practical question that should be answered based on the totality of the circumstances present in the particular case. *See McKinney*, 361 N.C. at 62; *Harris*, 568 U.S. at 244 ("We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach."). We therefore hold that the circumstances in this case supported a reasonable belief that Defendant's vehicle carried narcotics. Accordingly, the trial court's ultimate conclusion of law that officers had probable cause to search Defendant's vehicle was not erroneous, as it is supported by the circumstances laid out in the trial court's findings of fact that are binding on appeal.

## CONCLUSION

As the findings of fact support the trial court's ultimate conclusion of law, that officers had probable cause to search Defendant's vehicle based upon the totality of the circumstances, the trial court did not err in denying Defendant's *Motion to Suppress*.

AFFIRMED.

Judges DIETZ and WOOD concur.