IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-664

Filed 18 July 2023

Randolph County, Nos. 18CRS52296-99; 18CRS52424-25; 19CRS55461-62

STATE OF NORTH CAROLINA

v.

OEUN SAN

Appeal by Defendant from Judgment entered 11 January 2022 by Judge James M. Webb in Randolph County Superior Court. Heard in the Court of Appeals 24 January 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kelly A. Moore and Special Deputy Attorney General Martin T. McCracken, for the State.*

*Benjamin J. Kull for Defendant-Appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

Oeun San (Defendant) appeals from the denial of a Motion to Suppress and a subsequent Judgment entered upon Defendant's *Alford*[1] plea to Trafficking in Methamphetamine, Selling or Delivering a Schedule II Controlled Substance, and two counts of Possession of a Firearm by a Felon. As part of the plea agreement, the

[1] *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L. Ed. 2d 162 (1970).

State agreed to dismiss a number of other charges. Relevant to this appeal, the Record before us tends to reflect the following:

Defendant was charged with thirteen separate counts arising from four separate alleged offense dates. The first offense date was 15 May 2018, stemming from a traffic stop. As a result of this stop, Defendant was charged with Trafficking Methamphetamine by Possession, Trafficking Methamphetamine by Transportation, Conspiracy to Trafficking Methamphetamine by Possession, Conspiracy to Trafficking Methamphetamine by Transportation, Possession of a Firearm by a Felon, and Possession with Intent to Sell or Deliver Methamphetamine. The second offense date was the following day, 16 May 2018, as a result of a search warrant-based search of Defendant's home. This search resulted in Defendant being charged with Trafficking Methamphetamine by Possession, Conspiracy to Trafficking Methamphetamine by Possession, Keeping/Maintaining a Dwelling for Keeping/Selling a Controlled Substance, and Possession with Intent to Sell or Deliver Methamphetamine. The final two offense dates were 22 October 2019, when Defendant was charged with Selling/Delivering Methamphetamine and Conspiracy to Sell Methamphetamine, and 23 October 2019, when Defendant was charged with an additional count of Possession of a Firearm by a Felon. The State subsequently dismissed the charge of Keeping/Maintaining a Dwelling for Keeping/Selling a Controlled Substance.

On 30 April 2019, Defendant filed a Motion to Suppress alleging the search of the vehicle during the 15 May 2018 traffic stop and the 16 May 2018 search of his residence were in violation of both the United States and North Carolina Constitutions. Defendant's Motion to Suppress was heard on 26 July 2021. At the outset of the hearing, the State announced it consented to the suppression of evidence of drugs seized from Defendant's home resulting from the 16 May 2018 search warrant. As a result, the parties proceeded only on the issue of whether evidence seized as a result of the 15 May 2018 traffic stop should be suppressed. Defendant contended the traffic stop was impermissibly prolonged beyond the mission of the traffic stop without reasonable suspicion or consent. At the conclusion of the hearing, the trial court took the matter under advisement. Defendant provided notice that in the event the Motion to Suppress was denied, he intended to appeal the denial.

On 24 September 2021, the trial court entered its written Order denying the Motion to Suppress the evidence seized at the 15 May 2018 traffic stop. The trial court made the following—largely unchallenged—Findings of Fact:

> 1. That on May 15, 2018 Detective Richard Linthicum with the vice narcotics unit of the Randolph County Sheriff's Department ("Linthicum") received information that the [D]efendant was in possession of a large amount of methamphetamine. Linthicum described the provider of the information as a confidential and reliable informant; however, the Court heard no evidence as to this person's reliability, and no evidence corroborating the information.
>
> 2. That after receiving the information, Linthicum and other officers attempted to locate [D]efendant and conduct surveillance.

Linthicum located [D]efendant and a female, later identified as Jamie Little, driving a Ford Edge at the Dixie Suds Laundry . . . .

3.  Linthicum and Detective Hammer were in an unmarked Ford 150 [sic] truck parked at the Midtown Dixie gas station, and Linthicum noticed the Ford Edge parked next to a wall at the laundry.  He noticed [D]efendant and Ms. Little going back and forth from the vehicle to the laundry.

4.  The Ford Edge left the laundry and parked beside Linthicum's truck at the gas station, Ms. Little attempted to go in the gas station but it was closed.

5.  The Ford Edge left the gas station and Linthicum followed them . . . .

6.  That Linthicum noticed the Ford Edge cross the double center line when the vehicle turned left off of Highway 311 onto Stout Road, and he radioed this information to [Deputy] Kyle Cox ("Cox"), also with the Randolph County Sheriff's Department, who was driving a marked patrol vehicle, to conduct a traffic stop on the vehicle.  Linthicum pulled over on the side of the road to allow Cox to pass him to make the traffic stop.  Linthicum saw Cox initiate the stop and the Ford Edge stopped, and then Linthicum continued traveling on Stout Road and waited for further instructions.

7. That Cox initiated the traffic stop on the Ford Edge, the vehicle stopped[,] and Cox went to the driver's side of the vehicle, and told Ms. Little the reason he stopped her and asked for her driver's license and registration.  Ms. Little gave her driver's license and registration to Cox.

8.  That Cox went to his patrol vehicle, and ran a records check on Ms. Little and the vehicle, which took three to four minutes. Cox recognized [D]efendant as the passenger in the vehicle.

9.  That Cox then requested Ms. Little exit the vehicle so he could explain the warning citation to her, which is Cox's routine procedure.  Cox and Ms. Little walked behind the Ford Edge and in front of Cox's patrol vehicle.  Cox explained to Ms. Little the

warning citation while standing in front of the patrol vehicle, and asked Ms. Little if she had any questions. After Cox returned Ms. Little's documents, he then asked Ms. Little if there was anything in the vehicle that he needed to know about including guns, drugs, bombs, large amounts of U.S. currency or any other weapons. That Ms. Little said she had a gun on the seat. However, based on testimony from the other officers involved, they were not aware of this information until after the search of the vehicle.

10. That Detective Joshua Santiago and Detective John Lamb[e] with the Randolph County Sheriff's Department, Vice Narcotics Unit ("Santiago" and "Lamb[e]"), also arrived on scene. Santiago and Lamb[e] had previously been informed of the information that [D]efendant had a large amount of methamphetamine. Santiago is a certified K-9 handler of K-9, Lizzy. Lizzy was certified on cocaine, methamphetamine, heroin and marijuana.

11. That Santiago noticed Ms. Little sitting in the driver's seat of the Ford Edge when he and Lamb[e] arrived on scene. He then spoke to Cox, and Cox informed Santiago he was writing Ms. Little a warning ticket and he was going to get Ms. Little out of the vehicle to explain the warning ticket to her.

12. When Cox got Ms. Little out of the vehicle, Santiago asked Lamb[e] to get [D]efendant out of the vehicle due to Santiago readying to deploy Lizzy. While Cox and Ms. Little were in front of Cox's patrol vehicle, Santiago deployed Lizzy to complete an open air sniff around the vehicle.

13. That although Cox asked Ms. Little a question about whether she had anything in the vehicle he needed to know about after he returned her driver's license and registration and gave her the warning ticket, this open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her.

14. Lizzy sat, which is a passive alert, at the area of the front passenger door.

15. Based on Lizzy's alert, the vehicle and containers within the vehicle were searched.

The trial court then concluded: "Based upon a totality of the circumstances the [c]ourt concludes that the Defendant's [M]otion to [S]uppress for lack of probable cause should be denied."

On 11 January 2022, Defendant and the State entered a plea arrangement. Defendant entered an *Alford* plea to: Trafficking Methamphetamine by Possession and Possession of a Firearm by a Felon both arising from the 15 May 2018 offense date; Selling/Delivering Methamphetamine from the 22 October 2019 offense date; and Possession of a Firearm by a Felon from the 23 October 2019 offense date. The State agreed to dismiss all other pending charges. The trial court consolidated the four charges into a single judgment and sentenced Defendant to an active prison term of 70 to 93 months and imposed a $50,000 fine. Defendant's trial counsel announced in open court: "We had a motion to suppress. I gave notice in advance that if the motion was denied, we intend to give notice of appeal to the Court of Appeals. It was denied on September 24th of 2021, therefore we're giving notice of appeal for denial of that motion to the Court of Appeals."

## **Appellate Jurisdiction**

As an initial matter, Defendant filed a Petition for Writ of Certiorari in this Court in the event we deem his oral Notice of Appeal insufficient to preserve his appeal from the trial court's Judgment. "An order . . . denying a motion to suppress evidence may be reviewed upon an appeal from . . . a judgment entered upon a plea

of guilty." N.C. Gen. Stat. § 15A-979(b) (2021). However, a defendant must (1) notify the prosecutor and the trial court of his intention to appeal during plea negotiations and (2) provide notice of appeal from the final judgment. *State v. McBride*, 120 N.C. App. 623, 625-26, 463 S.E.2d 403, 404-05 (1995), *aff'd per curiam*, 344 N.C. 623, 476 S.E.2d 106 (1996).

Here, Defendant, through trial counsel, complied with only one of the two required steps to preserve his appeal from his guilty plea. Defendant complied with step 1 by notifying the prosecutor and trial court of his intent to appeal the denial of the Motion to Suppress prior to his plea being accepted. However, after Judgment was entered, trial counsel gave oral Notice of Appeal but specified the appeal was from the denial of the Motion to Suppress and failed to state the appeal was from the Judgment rendered by the trial court. As such, Defendant has lost his right to appeal from the Judgment entered by the trial court. *See State v. Miller*, 205 N.C. App. 724, 725, 696 S.E.2d 542, 542 (2010) (dismissing appeal where defendant gave written notice of appeal "from the denial of Defendant's motion to suppress," but did not specify the judgment itself).

Nevertheless, in the context of this case, we discern Defendant's intent to appeal from both the Motion to Suppress and the Judgment. Indeed, for its part, the State contends Certiorari is unnecessary as the State does not seek dismissal of the appeal. In our discretion, and in aid of our jurisdiction, we allow Defendant's Petition and issue our Writ of Certiorari. *See* N.C. Gen. Stat. § 7A-32(c) (2021).

**Issues**

The issues on appeal are whether: (I) Finding of Fact 13, that "the open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her," is supported by competent evidence in the Record; and (II) the trial court's Findings of Fact support its Conclusion: "Based upon a totality of the circumstances . . . Defendant's [M]otion to [S]uppress for lack of probable cause should be denied."

**Analysis**

"Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether [the trial court's] findings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion." *State v. Reynolds*, 161 N.C. App. 144, 146-47, 587 S.E.2d 456, 458 (2003) (citation and quotation marks omitted). The trial court's conclusions of law, however, are reviewed de novo. *See State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997) (citation omitted). "In reviewing the denial of a motion to suppress, we examine the evidence introduced at trial in the light most favorable to the State[.]" *State v. Moore*, 152 N.C. App. 156, 159, 566 S.E.2d 713, 715 (2002) (citations omitted).

I.    Finding of Fact 13

Defendant challenges only one of the trial court's Findings of Fact: Finding 13. In Finding of Fact 13, the trial court found:

That although Cox asked Ms. Little a question about whether she

- 8 -

had anything in the vehicle he needed to know about after he returned her driver's license and registration and gave her the warning ticket, this open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her.

In particular, Defendant contends the portion of the Finding that "this open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her" is unsupported by the evidence, self-contradictory and illogical, and further contradicted by Finding of Fact 12. We disagree.

First, there is competent evidence in the Record to support the trial court's Finding. Defendant focuses exclusively on Deputy Cox's written report. This report on its face indicates Deputy Cox had concluded the stop by issuing a warning ticket and asked Ms. Little if there was anything in the car Deputy Cox should know about like weapons, contraband, or large sums of currency. The Report further states "Detective Santiago *then* deployed his canine Lizzy . . . [.]" However, Defendant's reliance on Deputy Cox's report ignores other testimony and evidence, including Detective Santiago's testimony. Detective Santiago testified when he arrived on the scene to handle Lizzy while she conducted the open-air sniff, Deputy Cox was in the process of issuing the warning ticket and told Detective Santiago he was going to ask Ms. Little to step out of the car so he could explain the warning ticket to her. Once Deputy Cox asked Ms. Little to step out of the car to explain the warning ticket, Detective Santiago asked Detective Lambe to remove Defendant from the car, so

Lizzy could be deployed. Detective Santiago also testified that as he went to retrieve and deploy Lizzy, he briefly overheard the conversation between Deputy Cox and Ms. Little when Deputy Cox was still explaining the warning ticket. Lizzy conducted her open-air sniff while Deputy Cox and Ms. Little were still having their conversation. Detective Santiago's testimony was also consistent with his written report. Further, Detective Lambe testified when Deputy Cox asked Ms. Little to step out of the car, Detective Santiago asked Detective Lambe to remove Defendant from the car also, so Lizzy could be deployed. Detective Lambe's written report reflects "Deputy Cox had [Ms.] Little whom was driving the vehicle step out to explain the warning citation while Detective Santiago deployed K9. Before doing so I asked the male passenger to step out of the vehicle . . . ." This evidence, taken in the light most favorable to the State on appellate review, supports the finding "this open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her." *See State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012) ("The trial court's findings of fact on a motion to suppress are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." (citations and quotation marks omitted)).

Second, Finding of Fact 13 is not illogical or internally inconsistent. Defendant argues it is logically impossible for the open-air sniff to have started precisely simultaneously to both Ms. Little being asked to exit the vehicle and the warning ticket being explained to her—as those were two separate occurrences. Defendant

- 10 -

reads the Finding too narrowly. Rather, when read in context, it is apparent that the trial court, in this Finding, is acknowledging the evidence that after Deputy Cox finished his explanation, handed over the warning citation, and returned Little's license and registration, he *then* asked about items in the car—which could be seen as extending the traffic stop after its mission was completed. The trial court, however, goes on to clarify that the open-air sniff was initiated prior to Deputy Cox's inquiry. In other words, the open-air sniff was occurring prior to the stop arguably being extended beyond its mission.

Third, Defendant contends Finding of Fact 13 is contradicted by Finding of Fact 12. To the contrary, Finding of Fact 13 is perfectly consistent with Finding of Fact 12. Finding of Fact 12 states: "When Cox got Ms. Little out of the vehicle, Santiago asked Lamb[e] to get [D]efendant out of the vehicle due to Santiago readying to deploy Lizzy. While Cox and Ms. Little were in front of Cox's patrol vehicle, Santiago deployed Lizzy to complete an open air sniff around the vehicle." Defendant's argument, again, rests on an overly narrow focus on the trial court's use of the term "simultaneously" in Finding of Fact 13. However, Finding 12 reflects that Santiago began the process of deploying Lizzy when Ms. Little got out of the vehicle and Detective Lambe removed Defendant; Lizzy *then* performed the sniff while Deputy Cox and Ms. Little were in front of the patrol vehicle.

Thus, the trial court's Findings, read together, reflect that the sniff was, in fact, undertaken during the same time frame as Ms. Little getting out of the car and

Deputy Cox explaining the warning citation to her. Therefore, Finding of Fact 13 is supported by evidence in the Record and is consistent with itself and the trial court's other Findings. Consequently, Finding of Fact 13 may, in turn, also be relied on to support the trial court's Conclusions.

II.    The Trial Court's Conclusion of Law

Defendant further challenges the trial court's Conclusion of Law: "Based upon a totality of the circumstances, the [c]ourt concludes that the Defendant's [M]otion to [S]uppress for lack of probable cause should be denied." Defendant contends the trial court's Conclusion fails to articulate any rationale for its decision to deny the Motion to Suppress. Defendant further argues the trial court misapprehended the law applicable to traffic stops and warrantless dog-sniffs by relying on "a probable cause" standard. Finally, Defendant—relying on *Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L. Ed. 2d 492 (2015)—contends, even applying the correct standard, the trial court's Findings of Fact do not support its Conclusion of Law.

First, Defendant contends the trial court's Conclusion of Law is insufficient for appellate review because it fails "to provide the trial court's rationale regarding why" it denied the Motion to Suppress. [2] When ruling on a motion to suppress following a hearing, a judge "must set forth in the record his findings of facts and conclusions of

---

[2] Defendant actually raises this argument as an argument in the alternative should we reject his other arguments. For our purposes, however, we first review whether the trial court made a conclusion of law adequate for appellate review before reaching Defendant's more substantive arguments.

law." N.C. Gen. Stat. § 15A-977(f) (2021). As Defendant notes, our Court has

observed:

> When a trial court fails to make all the necessary determinations,
> *i.e.*, findings of fact resolving disputed issues of fact and
> conclusions of law applying the legal principles to the facts found,
> "[r]emand is necessary because it is the trial court that is
> entrusted with the duty to hear testimony, weigh and resolve any
> conflicts in the evidence, find the facts, *and, then based upon those
> findings, render a legal decision, in the first instance*, as to
> whether or not a constitutional violation of some kind has
> occurred."

*State v. Faulk*, 256 N.C. App. 255, 263, 807 S.E.2d 623, 629 (2017) (emphasis added)

(quoting *State v. Baskins*, 247 N.C. App. 603, 610, 786 S.E.2d 94, 99 (2016) (citations

and quotation marks omitted)). Here, however, the trial court made generally

unchallenged Findings of Fact and "based on those findings" did "render a legal

decision." *Id*. Indeed, in *State v. Aguilar*, we recently concluded a substantively

identical conclusion of law was reviewable, particularly when taken in context of the

findings of fact and prior trial court proceedings, "because the trial court here

explained that probable cause supported the search based upon the totality of the

circumstances in the findings." *State v. Aguilar*, 2022-NCCOA-903, ¶ 28, 882 S.E.2d

411, 423. Here, the trial court was tasked with ultimately determining whether law

enforcement officers had probable cause to search the vehicle as a result of a valid

dog-sniff. This is clear from the trial court's Findings of Fact as well as the

proceedings reflected in the hearing transcript. While additional conclusions

outlining the analytical steps undertaken by the trial court would certainly be more

helpful in our review, here, we are able to discern the basis of the trial court's ruling and conduct our review.

Relatedly, Defendant further argues the trial court's Conclusion of Law constitutes a misapprehension or misapplication of the law, because—Defendant asserts—the real issue is not whether the dog-sniff provided probable cause to search the vehicle without a warrant but rather whether the dog-sniff itself was permissible as part of the traffic stop. As such, Defendant contends the trial court erred in applying a "probable cause" legal standard in its Conclusion rather than analyzing whether the dog-sniff occurred during the original mission of the traffic stop or was otherwise supported by reasonable suspicion of other criminal activity under *U.S. v. Rodriguez*.[3] While we agree with Defendant that the underlying issue is whether the dog-sniff—which led to the warrantless search—was validly conducted in the course of the traffic stop, we disagree the trial court's Conclusion of Law reflects a misapprehension of law.

To the contrary, the ultimate question for the trial court was whether there was probable cause to conduct the warrantless search of the vehicle primarily based on the positive alert from the dog-sniff, which necessarily required the trial court to

---

[3] For its part, the State contends there was probable cause to initiate the search based on the totality of the circumstances including a tip from a confidential, reliable informant, knowledge of the firearm in the vehicle, and knowledge of Defendant's prior criminal history. None of these circumstances, however, are supported by the trial court's Findings. To the contrary, the trial court expressly made no findings about the reliability of the informant; the officers conducting the search were not aware of the firearm until after the search; and there is no finding regarding Defendant's prior history.

first consider the validity of the dog-sniff.[4] Nevertheless, "[a]ssuming arguendo that the trial court's reasoning for denying defendant's motion to suppress was incorrect, we are not required on this basis alone to determine that the ruling was erroneous." *State v. Austin*, 320 N.C. 276, 290, 357 S.E.2d 641, 650 (1987) (citing *State v. Gardner*, 316 N.C. 605, 342 S.E.2d 872 (1986)). "A correct decision of a lower court will not be disturbed on review simply because an insufficient or superfluous reason is assigned. The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable." *Id*. (citing *State v. Blackwell*, 246 N.C. 642, 644, 99 S.E.2d 867, 869 (1957)). "The crucial inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence." *Id*.

Ultimately, Defendant argues the trial court's Findings cannot support a determination the dog-sniff was validly conducted during the traffic stop consistent with Fourth Amendment jurisprudence. Specifically, pointing to *Rodriguez*, Defendant contends the Findings—and in the absence of any finding of reasonable suspicion of other criminal activity—do not support a conclusion the dog-sniff was conducted prior to the completion of the original mission of the stop. As such, Defendant asserts the trial court's denial of the Motion to Suppress should be reversed and the trial court's Judgment vacated.

---

[4] In the absence of a valid dog-sniff, the trial court may well have determined there was no probable cause to perform a warrantless search of the vehicle on the facts before it.

The Fourth Amendment of the Constitution provides the right of the people to be secure in their persons and protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV.; *see also* N.C. Const. art. I, § 20; *State v. Garner*, 331 N.C. 491, 506-07, 417 S.E.2d 502, 510 (1992). These protections apply to "seizures of the person, including brief investigatory detentions such as those involved in the stopping of a vehicle." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69-70 (1994) (citation omitted). "Thus, a traffic stop is subject to the reasonableness requirement of the Fourth Amendment." *State v. Reed*, 373 N.C. 498, 507, 838 S.E.2d 414, 421-22 (2020). "A traffic stop may become 'unlawful if it is prolonged beyond the time reasonably required to complete [its] mission.' " *Id.* at 508, 838 S.E.2d at 422 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L. Ed. 2d 842, 846 (2005)).

In *Rodriguez*, the Supreme Court of the United States clarified:

> [a] seizure for a traffic violation justifies a police investigation of that violation. . . . [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"— to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

575 U.S. 348, 354, 135 S.Ct. 1609, 1614, 191 L. Ed. 2d 492, 498 (2015) (citations and quotation marks omitted).

However, the *Rodriguez* Court also acknowledged: "the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention." *Id.* Nevertheless, a traffic stop " 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.* (quoting *Caballes*, 543 U.S. at 407, 125 S.Ct. at 837). "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' " *Id.* at 355, 135 S.Ct. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 788, 172 L. Ed. 2d 694, 704 (2009)). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

Applying *Rodriguez*, the North Carolina Supreme Court recognizes: "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *State v. Bullock*, 370 N.C. 256, 257, 805 S.E.2d 671, 673 (2017) (citation and quotation marks omitted) (alteration in original). "These inquiries include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citation and quotation marks omitted). "In addition, 'an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely[,]' " including conducting criminal history checks. *Id.* at 258, 805 S.E.2d at 673-74 (citations omitted). Officer safety "stems from the mission

- 17 -

of the traffic stop"; thus, "time devoted to officer safety is time that is reasonably required to complete that mission." *Id.* at 262, 805 S.E.2d at 676. "On-scene investigation into other crimes, however, detours from that mission." *Rodriguez*, 575 U.S. at 356, 135 S.Ct. at 1616. Moreover, "traffic stops remain[ ] lawful only so long as [unrelated] inquiries do not *measurably* extend the duration of the stop." *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676 (alterations and emphasis in original) (citation and quotation marks omitted).

Relevant to this case, this Court, applying *Rodriguez*, has recognized: "The [*Rodriguez*] Court specifically held that the performance of a dog sniff is not a type of check which is related to an officer's traffic mission." *State v. Warren*, 242 N.C. App. 496, 499, 775 S.E.2d 362, 365 (2015), *aff'd per curiam*, 368 N.C. 756, 782 S.E.2d 509 (2016). "Therefore, under *Rodriguez*, an officer who lawfully stops a vehicle for a traffic violation but who otherwise does not have reasonable suspicion that any crime is afoot beyond a traffic violation may execute a dog sniff only if the check does not prolong the traffic stop." *Id.* Indeed, the United States Supreme Court had previously concluded "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy. Our cases hold that it did not." *Caballes*, 543 U.S. at 408, 125 S.Ct. at 837.

In this case, the trial court's Findings demonstrate the dog-sniff was undertaken prior to the completion of the mission of the traffic stop. In particular, the trial court found:

> 11. That Santiago noticed Ms. Little sitting in the driver's seat of the Ford Edge when he and Lamb[e] arrived on scene. He then spoke to Cox, and Cox informed Santiago he was writing Ms. Little a warning ticket and he was going to get Ms. Little out of the vehicle to explain the warning ticket to her.
>
> 12. When Cox got Ms. Little out of the vehicle, Santiago asked Lamb[e] to get [D]efendant out of the vehicle due to Santiago readying to deploy Lizzy. While Cox and Ms. Little were in front of Cox's patrol vehicle, Santiago deployed Lizzy to complete an open air sniff around the vehicle.
>
> 13. That although Cox asked Ms. Little a question about whether she had anything in the vehicle he needed to know about after he returned her driver's license and registration and gave her the warning ticket, this open air sniff around the vehicle started simultaneously to Cox asking Ms. Little to exit her vehicle and explaining the warning ticket to her.

Crucially, these Findings tend to establish the dog-sniff was undertaken during the process of Cox explaining the warning ticket to Ms. Little and prior to Cox asking the question potentially unrelated to the mission of the stop. As such, the trial court's Findings support a determination the traffic stop was not prolonged by, or for, the dog-sniff.

Thus, the trial court's Findings support a determination the dog-sniff which led to the search of the vehicle was validly conducted during the time reasonably required to complete the mission of the traffic stop. *See Rodriguez*, 575 U.S. at 354,

135 S.Ct. at 1609. Therefore, the trial court properly concluded "Based upon a totality of the circumstances"—including the validly conducted dog-sniff—"the Defendant's [M]otion to [S]uppress should be denied." Consequently, the trial court did not err in denying Defendant's Motion to Suppress.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm both the trial court's Order denying the Motion to Suppress and the Judgment entered upon Defendant's *Alford* plea.

AFFIRMED.

Judges ZACHARY and GRIFFIN concur.